GEORGE T. WENTZEL, RESPONDENT, v. LAKE LOTAWANA DEVELOPMENT COMPANY, INC., ET AL., DEFENDANTS; MAUDE THOMPSON, EXECUTRIX OF THE ESTATE OF MILTON THOMPSON, DECEASED, APPELLANT.—48 S. W. (2d) 185.

Kansas City Court of Appeals. February 29, 1932.

962

964

*Paul C. Sprinkle* and *Ingraham D. Hook* for respondent.

*Burns & White* for appellant.

ARNOLD, J.—This is a suit in damages, growing out of the relations of the parties in the clearing of a site for Lake Lotawana, a pleasure resort in eastern Jackson County. As originally brought, Lake Lotawana Development Company, a corporation, and Milton Thompson, were defendants. Before the trial, plaintiff dismissed as to the Lake Company and the cause proceeded against Milton Thompson, as sole defendant. After the appeal was lodged in this court and before it was set for hearing, Milton Thompson died and, on stipulation, the cause has been revived in the name of Maude Thompson, executrix of his estate, as appellant. For convenience, respondent will be referred to as plaintiff, Milton Thompson as the defendant, and Lake Lotawana Development Company, a corporation, as the Lake Company.

On February 3, 1928, plaintiff and the Lake Company entered into a contract in writing, by the terms of which plaintiff agreed to furnish labor and necessary tools and appliances to clear of trees and brush approximately 600 acres of the Lake Company's site, according to a survey and plat thereof. For this work, he was to receive the sum of $16,000, payable as follows: $3200, when the first 150 acres was cleared, and an additional $3200, as each subsequent 150 acres cleared; balance of $3200 to be paid by the Lake Company when the contract was completed to the satisfaction of the engineer in charge, and proof that all bills had been paid. The work was to begin within six days after the signing of the contract and to be completed within eight months. The contract also con-

tained provisions as to the method of clearing, and disposition and ownership of fallen trees. Provision was made for an adjustment of amount to be paid, pro rated as the lake proved to be larger or smaller than the estimate of 600 acres. Plaintiff agreed to maintain liability insurance under the Workmen's Compensation Act, and gave a surety bond, guaranteeing his faithful performance of the contract. On February 4, 1928, plaintiff went to work, with a large force of men, clearing a strip about 200 feet wide, beginning at the proposed dam site and working around the proposed shore line. This was in accordance with a provision of the contract, and as stated therein, the purpose was to enable prospective customers for lodge sites to visualize the shore lines and extent of the lake. This work of clearing a 200-foot strip consisted of felling the trees, cutting off the larger limbs and burning the brush and tops. Most of the logs were cut into saw mill lengths. Cord wood and all merchantable timber was left on the ground. Having cleared this 200-foot strip around the lake, with the exception of small areas which plaintiff was asked by the engineer to leave, plaintiff's crew cut most of the timber adjacent to the dam site. Some trees were left standing, at the request of Mr. Matches, the general manager of the Lake Company, and of Mr. Sheley, its engineer. There was also a clump of trees left, for shade, at the site of a saw mill which had been erected to dispose of the saw logs. The lake site consisted of the basin of one larger creek and seven or eight tributary creeks, and trees were left standing in the bed of these streams, under a provision of the contract to the effect that such trees were to be felled last, so as not to interfere with the natural flow of the streams, and finally anchored in the creek beds, as propagating beds for fish, after the lake had formed.

As soon as he had cleared 150 acres of the lake bed, plaintiff began demanding money, under his contract. The company engineer made an estimate of the amount cleared, at the request of Mr. Matches, and reported more than the amount specified had been cleared; but no money was paid to plaintiff, because, as Mr. Matches said, he had no money with which to pay. Plaintiff continued to work without payment until March 3, 1928, at which time he had cleared approximately 300 acres, and claimed two payments of $3200, each. He quit on that day, withdrew his men and did no more work until March 22, 1928, relying upon a provision of the contract to the effect that in case of a breach of any of the payments or covenants of the contract "the contractor (plaintiff) may cease all work until payment or settlement of account is made."

It is in evidence that when the contract was made there were several tracts of land, owned by other parties, included within the Lake Company's plan, which had not been acquired by the company.

This fact was known to the Lake Company, but not to plaintiff. When plaintiff's men reached these tracts in the process of clearing, they were stopped by the owners or tenants and admittance to the land was refused. This delayed plaintiff in clearing the 200-foot strip around the shore line of the lake, and caused him to shift his force to other points. It is also in evidence, with reference to these tracts, that Mr. Thompson, the defendant, was negotiating with the owners for them, and did finally acquire warranty deeds to the properties, taking title in himself and the appellant, his wife. At this time (March, 1928), the Lake Company had no funds and was looking to Mr. Thompson to advance money for payment to plaintiff on his contract, and it is in evidence that Mr. Thompson said he would advance no money until the Bowman, McGrath and McCandless controversies were cleared up. About March 20, 1928, Mr. Thompson secured the Bowman deed, advanced $2500, to the Lake Company which was paid plaintiff on his contract, and on March 22, plaintiff again went to work and continued until about June 14, 1928. At that time, he had substantially completed the operation of felling trees and clearing the land of brush. Up to that time, he had been paid the sum of $8400, as follows: March 22, 1928, $2500; April 2, 1928, $700. This $3200 was the first payment due him on the clearing of approximately 150 acres of lake site. On April 14, he received $1,000; April 21, $1,000; April 27, $200; May 1, $1,000 which $3200 was the second payment due him for clearing another 150 acres. On May 10, he received $500, May 14, $500, and June 2, $1,000, a total of $2000, on the third payment of $3,200, due him, according to the evidence. All of this money was advanced by Mr. Thompson, at the request of Mr. Matches, general manager of the Lake Company, because the company had no money with which to pay. Plaintiff did no more work under the contract after about June 14, 1928. Sub-contractors who had contracted with plaintiff for the sawing and removal of lumber continued to work through the summer. Defendant Thompson went to Europe on a vacation about July 1, 1928, and nothing more was done until after his return in the fall.

On October 4, 1928, the Lake Company wrote a letter to the Maryland Casualty Company, on plaintiff's bond, stating plaintiff had not completed his work according to contract, declaring the contract forfeited and calling upon the bonding company for all damages sustained thereby. This letter was returned to the Kansas City office of the bonding company and was communicated to plaintiff. Shortly thereafter, defendant caused a notice to be inserted in a Kansas City daily paper, reading, in part, as follows:

"Highland Farms, Lee's Summit,

"Milton Thompson, Missouri.

"Owner.

"I have been interested financially in the Lake Lotawana Development since its very inception, but the press of other business has prevented my taking an active executive part in the project.

"Now, however, my holdings in the Development have been materially increased, and I am free to assume a direct and personal interest in its management.

"At the outset I wish to guarantee personally that the lake will be completed. The dam will be built, the roads and entrances constructed according to the original plans.

"Anyone purchasing property from the Lake Lotawana Development Company can do so with the full assurance that the lake will be completed faithfully and promptly.

"My desire to see the lake completed as early as possible is not entirely selfish. . . .

"Respectfully,

"Milton Thompson."

Following receipt of the notification of cancellation of the contract by the Casualty Company, the latter wrote the Lake Company on October 10, 1928, that it would investigate, and directed that any balance due plaintiff in the hands of the Lake Company be withheld for its further orders.

Mr. Miller, Kansas City representative of the Maryland Casualty Company, and its local counsel, Mr. Spencer Harris, upon receipt of this correspondence, went to see Mr. Thompson who went over the lake site with them, and the matter of plaintiff's work was discussed. As a result of this conference, and the publication by defendant of the notice from which we have quoted, within a few days Mr. Miller, Mr. Harris, plaintiff Wentzel and his attorney, Mr. George H. English, drove out to the home of defendant and discussed the whole matter. Mr. Wentzel was claiming he had not breached the contract and that Thompson had; Thompson claiming he had not breached the contract and that Wentzel had. After going over the lake site, they all returned to Mr. Thompson's house, at which time and place it is alleged a new but oral contract was entered into between plaintiff and defendant.

Plaintiff's evidence is that he or his counsel stated plaintiff would not deal further with the Lake Company because it was not financially responsible; that plaintiff could not afford to proceed and asked defendant for money; that defendant said he would not pay any more money until the cleaning up was completed; that defendant was of the opinion not enough remained due plaintiff to pay for cleaning up; that plaintiff cleaned up an experimental acre,

selecting one of the most difficult acres to clean, and the cost thereof was about $11; that plaintiff estimated the rest of the lake site could be cleaned up for about $3,000.

The testimony of plaintiff and his counsel and of Mr. Miller, representative of the Casualty Company and Mr. Harris, its counsel, is substantially, that defendant said if plaintiff would go ahead and clean up the lake site, defendant would pay him the balance due. Mr. English also testified defendant said he would pay plaintiff damages sustained by delay on the written contract with the Lake Company; plaintiff had no recollection as to this part of the conversation. Defendant's testimony was, ''I said, 'I will pay the money—;'' I said 'I will see the money is paid!' '' Further, he said: ''I will see the Lake Company pays the money, he will get his money, and get it as soon as the land is cleared.''

Plaintiff began cleaning the lake site on October 18, and worked until November 12, 1928, putting in nine and one-half days actual work, only, during that time because of bad weather. He estimated he could clean the lake site in sixty days. On said November 12, defendant came to the lake site and told the foreman of plaintiff to quit work at once. No reason was given, and the foreman immediately withdrew his men. Shortly thereafter plaintiff began his suit for damages for breach of contract. As stated, plaintiff's first amended petition joined as defendants the Lake Company and Thompson, but upon demurrer for misjoinder of parties being sustained, plaintiff dismissed as to the Lake Company, amended his petition, and proceeded against Thompson as sole defendant.

The jury returned a verdict for plaintiff for $5600, and, after unsuccessful motions for new trial and in arrest, defendant appealed to this court.

The appellant has presented a brief containing nineteen assignments of error and complaining of forty erroneous rulings of the trial court. From an abstract of 639 pages, we glean the evidence applicable to these assignments.

The first charge is the court erred in refusing to give defendant's instruction ''B'' in the nature of a demurrer offered at the close of the entire case, because the contract alleged is within the Statute of Frauds, Section 2967, Revised Statutes 1929. Said instruction ''B'' is as follows:

''At the close of all the evidence the court instructs the jury that under the law and the evidence your verdict must be for the defendant.''

Defendant's position is that it is conceded no writing was entered into by defendant; that plaintiff's case is based upon an alleged oral agreement by defendant to assume the obligations of a written contract between plaintiff and the Lake Company. In support of this

contention, appellant cites cases holding substantially as stated in Swarens v. Pfnisel, 26 S. W. (2d) (Mo.) 951:

"Where goods are sold or service rendered to one person on the oral promise of another to be answerable therefor, the contract is collateral and comes within the Statute of Frauds, the promisor is not liable if the person to whom the goods are sold or for whom the service is rendered remains liable; but if in such case the promisee looks alone to the promisor, it is an original undertaking and such person is liable."

In answer to this contention plaintiff says, first, appellant is in no position to interpose the defense of the Statute of Frauds, for the reason that, while defendant pleaded the statute, he made no objection to evidence offered by plaintiff as to the oral contract and asked no instruction thereon. To support his position plaintiff cites the case of Large v. Frick, 256 S. W. 90, 93, wherein this court said:

"As the benefit of the Statute of Frauds is an affirmative defense, 'it must be pointedly brought to the attention of the trial court in some way, either by objection to the evidence on that ground, or by requests for instruction on that theory' (citing cases). Nothing of the sort was done. Defendant asked no instruction save the following, which it contends is a demurrer to the evidence and should have been given:

"'The court instructs the jury that under the law and the evidence in this case your verdict must be for the defendant in the sum of $76.25, . . .'"

Other cases cited by plaintiff are to the same effect. The evidence offered by plaintiff on this point, and the record, support his contention. The testimony of plaintiff himself, his counsel, Mr. English, and that of Mr. Miller and Mr. Harris as to the oral statements of Mr. Thompson as to what he would do, all went in without objection. On this point, appellant contends defendant's refused instructions S, T, U and H, cover the Statute of Frauds, as they all deal with elements of it. These instructions would have told the jury that plaintiff could not recover damages because the trees he cut in the spring were green and covered with leaves; or that he was delayed by the controversy over the Bowman and other tracts; or that the Lake Company failed to pay him money when demanded. It cannot be conceded these instructions, if given, would properly have covered the defense of the Statute of Frauds, nor do they satisfy defendant's failure to object to the admission of evidence of the oral contract.

But we prefer to base our decision upon other grounds. Plaintiff contends a new contract was made on October 19, 1928, between plaintiff and Thompson at the conference at defendant's house. It is in evidence plaintiff had ceased work in June on the Lake Com-

pany contract because of failure to receive payments claimed by him to be due, and had withdrawn his men. Also that the Lake Company, when the eight months' time limit fixed by its contract with plaintiff, expired, notified the bonding company the contract was forfeited and terminated, and as heretofore stated, the parties met at defendant's house because defendant had demanded of the bonding company that it do something toward completing the contract, and because plaintiff was contending to the bonding company that he had not failed to perform his contract, but had discontinued performance for failure of the Lake Company to pay him; and the bonding company was taking the position that it could not be a referee in the matter or undertake to complete the contract. The parties went over the lake site, and defendant pointed out what he claimed had been left undone, and plaintiff pointed out the experimental acre he had cleaned for $11, and returned to defendant's house for further consideration of the matter. Plaintiff was insisting he would not deal with the Lake Company; that its financial status was not good according .to Dun and Bradstreet reports he had received, and that he did not have money to go ahead and finish the job, because he had not received the payments which the Company had agreed to make. Defendant stated he would not pay any more money until plaintiff had completed the clearing and cleaning of the lake. Plaintiff's testimony as to the interview with defendant is as follows:

"Q. What did he say with reference to paying? A. He said he would pay me when I had completed the cleaning of the lake bed.

"Q. State whether or not anythig was said with reference to these damages that you had suffered from the delays before that time. A. There was.

"Q. What did he say with reference to paying damages, if anything? A. I don't recollect his having remarked about paying damages.

"Q. What did he say he would pay? A. He would pay the contract price, the balance on the contract price.

"Q. What did you do following that conversation? A. We immediately proceeded to work.

. . . . . . .

"Q. What exact words did he use with reference to his (Thompson) paying you this money that was due? A. He said, 'Mr. Wentzel, I will not pay you any more money until you have completed the contract.'

"Q. Did he say, or not, he would pay you if you completed the contract? A. Yes, sir, he did. He said, 'I will pay you the money just as soon as the contract is completed, and not before.'

"Q. Was anything said at that time with reference to the company paying you the amount? A. No, sir."

Mr. Spencer Harris testified that upon receipt of the correspondence from the home office of the bonding company relating to cancellation of the contract by the Lake Company, and the bonding company's reply, early in October, he and Mr. Miller went over the matter with plaintiff and Mr. English, and then he and Mr. Miller went out to see defendant. At that time they drove over the lake site and defendant called attention to conditions there. Another conference was arranged which was the meeting at Mr. Thompson's house on October 19, as to which Mr. Harris testified:

"Q. Was the question of whether Mr. Wentzel was willing to extend credit to the Lake Lotawana Development Company raised? A. Yes.

"Q. In what form? A. He gave three reasons for his not continuing the work; one was that Mr. Thompson refused to let him, and the other was that Mr. Thompson had refused to pay him, and the other was that the Lake Lotawana Development Company was insolvent, and he didn't know, if he completed the contract, if he would get his money.

"Q. What did Mr. Thompson want Mr. Wentzel to do? A. He wanted him to go ahead—finally consented to let him go ahead and complete it.

"Q. Now what did Mr. Thompson say with reference to the payment to Mr. Wentzel, if he would go ahead and complete it? A. That was discussed and I even think we had a copy of the newspaper advertisement shortly before that, that appeared in February, and Mr. Wentzel wanted Mr. Thompson to agree to pay if he completed it, and Mr. Thompson said he would.

"Q. Did Mr. Thompson say he personally would pay that? A. He did; I say Mr. Thompson said he would pay it.

"Q. If Mr. Wentzel would go ahead and complete it? A. Yes, if Mr. Wentzel would go ahead and complete it.

"Q. I hand you Exhibit 6, is that the newspaper announcement that was discussed at that time? A. Yes. Mr. Thompson said he had taken the thing over.

"Q. Did Mr. Wentzel say he would accept Mr. Thompson's offer to go ahead and complete the work? A. Yes, sir. Mr. Thompson's discussion of the matter was that he wanted the matter cleared in time for the closing of the lake, and it was discussed about that, and Mr. Wentzel said that he could complete it in sixty days from that time."

On cross examination, Mr. Harris further testified:

"Q. And you say Mr. Thompson said he would pay? A. Yes.

"Q. Is that the words he used? A. As near as I can remember.

972

"Q. Didn't he say the Lake Lotawana Development Company would pay? A. He certainly did not.

"Q. That he would see that the Lake Lotawana Development Company would pay? A. No sir, Mr. Wentzel said he would not take the Lake Lotawana Development Company.

"Q. But Mr. Thompson, did he say he would see the Lake Company would pay? A. No, sir, he said he would pay; he said he owned it all."

Mr. Miller testified to his trip with Mr. Harris to the home of defendant on the 15th of October; of the newspaper notice from which we have quoted, of date October 14, and of the second meeting with Thompson on October 19. He recounted the trip over the lake site, the fact that plaintiff had pointed out the experimental acre which he had cleared to ascertain what it would cost to complete the job, and the return to Mr. Thompson's house. He further testified:

"Q. What happened there? A. There was a general discussion of the whole situation, mostly as to the payment; Mr. Wentzel was insisting as to who was to pay if he went in there and completed this work.

"Q. What was Mr. Thompson insisting on in reference to Mr. Wentzel going in and doing the work—did Mr. Thompson ask Mr. Wentzel to go ahead and complete the job, or not? A. Well, as I recall the thing, there was not much conversation about that, but it was a question with Mr. Wentzel, and he wanted to be sure he was going to get his money if he did go in and do it.

"Q. What did Mr. Thompson say with reference to Mr. Wentzel getting his money? A. Mr. Thompson said if he would go in there and do it—that he had taken the thing over—and if he would go in there, he would pay him."

On cross examination:

"Q. Now, you say that Mr. Thompson said that he had taken the lake over? A. That is my recollection, that he had, when this question of financial responsibility came up, I think Mr. Thompson said he had taken the thing over entirely, and he had published that fact, I think that is the words that he used.

"Q. Didn't he say he was managing it for the Lake Company? A. No, he didn't; he said he had taken it over."

Mr. English testified substantially to the same effect; that there was a discussion as to whether the amount unpaid, $7600, was sufficient to complete the job, and Mr. Wentzel said he could finish in sixty days and within that amount. Mr. English also testified he referred to the damages plaintiff had sustained by the delay on the Lake Company contract, and that defendant said: "I will pay the money if Mr. Wentzel will go on and do the work." And on cross examination this witness stated:

"Q. What words did he use, in which he agreed to pay those damages? A. He said, 'You see, Mr. Wentzel, you see my attitude,' and stated what his claims were. And I said he would not trust the Lake Lotawana Development Company to pay them, and Mr. Thompson said, in substance, as near as I can recall it, that if Mr. Wentzel would go on and do the work, he would pay it. I say they were all included together."

Defendant's version of this conference is as heretofore quoted. He also denied there was any conversation about damages, or that he agreed to pay any damages sustained by plaintiff in the breach of the first contract.

Plaintiff's contention is that a new contract was made at the home of defendant on October 19, 1928, whereby plaintiff agreed to clean the lake site for defendant, for an agreed consideration of $7600 (the amount which had not been paid on the former contract) and whatever damages plaintiff had sustained by delay on that contract. As stated, appellant's position is that plaintiff relies upon an oral agreement by defendant to assume obligations of the written contract between plaintiff and the Lake Company; that this is so because in his amended petition, plaintiff joins the Lake Company and Thompson as defendants and charges them with breach of contract; that plaintiff obviously did not release the Lake Company when he contracted with Thompson, but seeks to make defendant Thompson a guarantor of the Lake Company's contract.

Appellant's contention in this regard is considerably weakened, if not entirely destroyed, by the state of the pleadings. Plaintiff's first amended petition is set out in the printed abstract of the record, in which Thompson and the Lake Company are joined as defendants; and it is charged therein that after plaintiff had partly performed his contract with the Lake Company and had ceased work thereunder because that company made default in payments, the defendant Thompson, for good and valuable consideration, assumed all the obligations of said contract and so represented to plaintiff, and promised and agreed to pay plaintiff all sums due or to become due thereunder; that defendant thereby became equally obligated with the Lake Company to the plaintiff for the performance of the contract and equally liable for the damages plaintiff suffered from the breaches thereof. To this petition, each defendant interposed demurrers, on the ground that there was an improper joinder of causes of action, one against the Lake Company *ex contractu* on a written contract, and the other against defendant, *ex contractu*, on an assumption of liability; and that there was an improper joinder of parties defendant. There were other grounds on which the court overruled the demurrers but they were sustained as to the grounds above set out. Thereupon plaintiff amended his petition,

974

by interlineation, and dismissed his cause of action as to the Lake Company, and the trial proceeded on the petition as amended, against Thompson alone. We are not advised by the abstract as to what this amendment contained, but it is safe to assume that, upon the dismissal by plaintiff as to the Lake Company, all allegations of the petition as to the obligations and acts of that defendant fell out of the case, and the amendment, no doubt, was addressed to the matter of charging the remaining defendant with breach of the contract alleged.

The rule of law contended for by appellant is that where service is rendered to one person on the oral promise of another to be answerable therefor, the contract is collateral and comes within the Statute of Frauds, the promisor is not liable if the person for whom the service was rendered remains liable.

Plaintiff dismissed his case against the Lake Company and thereby dismissed his claim, if any he had, against that company. Defendant had the right to offer the abandoned pleading in evidence as tending to show plaintiff was looking to the Lake Company for payment, and let the jury consider it for what it was worth; but this was not done. Plaintiff's position on this point is that it is immaterial, under the facts disclosed by the record, whether the Lake Company was still liable or not. In other words, that this case is within the exception to the general rule, announced by the St. Louis Court of Appeals, in Hill Brothers v. Bank of Seneca, 100 Mo. App. 230, and referred to and approved by the Supreme Court in Swarens v. Pfnisel, 26 S. W. (2d) 951. The exception to the rule is that where the contract is made for the exclusive benefit of the promisee and he received the benefit in the continued work of the promisor, it is wholly immaterial that, in consequence of the performance of the contract, the debt of some one else will be paid, and immaterial, too, whether or not the original debtor remains liable.

That rule applies to this case. It is in evidence that defendant owned a large portion of the land which went into this lake project; that he advanced the money with which other portions of the site were purchased, taking title to some of it, at least, in his own name; that he held a mortgage or deed of trust on all of it, for money advanced; that he held all of the stock in the Lake Company by assignment from the persons to whom it was originally issued; that he held the resignations of the officers of the Company; that he advanced to the Company all the money which went to pay plaintiff; that the Lake Company had no money of its own except for a few small amounts paid in by various persons, some of that for fractional lake sites; that no action of any consequence was taken without his approval. Defendant admitted publication of the newspa-

per notice stating his holdings in the development had been materially increased, and that he was assuming a direct and personal interest in its management, and that he personally guaranteed that the lake would be completed, the dam built, etc., and that anyone purchasing lots from the Lake Company could do so with the full assurance from him that the lake would be completed faithfully and promptly. We do not hold the facts just set forth conclusively establish a liability on defendant in this case. They were only circumstances and facts to be considered by the jury in connection with all the other testimony.

But there was also testimony that at the conference at Mr. Thompson's house he said he had taken it over; that he owned it all; he was in personal charge of the matter of clearing up the lake bed; he said, "I will pay you when you clean it up and not before." Both plaintiff and defendant were treating the contract with the Lake Company as ended; plaintiff was refusing to have any dealings with the Lake Company, but was willing to do the work for defendant. According to plaintiff's evidence, defendant did not claim he was representing the Lake Company, but that the contract was entered into as a direct result of representations made by defendant to the general public that he would personally see that the lake project was completed, and, when plaintiff undertook to finish cleaning up the lake site, he was advancing defendant one step nearer the fulfillment of the representations made by defendant; and, since defendant held all of the stock in the Lake Company and held a mortgage on all of its property, the value of his securities and holdings were materially increased by plaintiff's performance of the contract. It is evident the original contract was made for the exclusive benefit of defendant and he received the benefit thereof, until he prevented plaintiff from further performing, by ordering him off the lake site.

Plaintiff asked damages in the sum of $12,600. This was made up of $4,600, which he claimed he was prevented from making as the profits of clearing the lake site, by the action of defendant in ordering him off before the work was finished; $5,000, the reasonable value of the timber on the site when he was relieved and which timber he was prevented from removing; $2,000 additional expense he was put to under the Lake Company contract by reason of delays caused by that company, making it necessary to remove trees and brush after the sap had risen and leaves appeared; and $1,000 loss suffered by him from delay of the Lake Company in making payments.

Plaintiff contends that when defendant agreed to pay him for cleaning the lake site, he also agreed to pay him what he sustained in damages due to acts of the Lake Company in delaying the work. There was evidence introduced tending to support this contention. The oral contract must be interpreted in the light of the relation

of the parties at the time. it was made. Both by his published newspaper notice and orally, defendant represented he had taken over the lake development; he even went so far as to say he owned it all. In the light of those representations, plaintiff had a right to assume he was contracting with the owner of the property for the defendant's benefit, and not for the benefit of the Lake Company, with which he refused to have any dealings. He was relying upon the credit of defendant and not upon that of the Lake Company, and he had no reason to question what defendant said about owning it all. Defendant personally conducted all the negotiations in his own name and he personally directed the work on the ground. To all intents and purposes, the contract was for his sole benefit and it is immaterial that incidentally the corporate entity was relieved of payment for its breach of contract, or that its holdings were increased by the efforts of the plaintiff, in performing his contract with defendant. The testimony presented an issue for the jury and they decided the contract between plaintiff and defendant was not for the benefit of the Lake Company, but for the benefit of Thompson. There was substantial evidence to support this finding.

The second reason advanced by appellant as to why its demurrer should have been sustained is that the alleged agreement sued upon was wholly without consideration. And for a third reason, appellant urges plaintiff was in default on his contract with the Lake Company and had forfeited all rights thereunder.

The first of these contentions has been disposed of in the discussion of appellant's first point. Disposition of the third point requires a statement of the evidence.

The written contract between plaintiff and the Lake Company required plaintiff to complete the clearing (no grubbing) of the lake site of approximately 600 acres. The contractor also agreed to cut and remove all trees from the premises, by whatever means he deemed best, except as follows: The Lake Company had the option to retain all saw logs eight to ten inches or over in diameter, and was to stack them above water line at its own expense. The owner agreed to give plaintiff notice within two weeks of his commencing work of its election to take or reject these logs. If it rejected them, plaintiff had the option to give it such logs as he saw fit. The Lake Company also retained for itself for cordwood, limbs cut in pole lengths, three to six inches in diameter, in any amount it desired, which also were to be removed from the lake bed by the Lake Company. Plaintiff also agreed first to clear a strip 200 feet wide at the proposed shore line, entirely around the lake, beginning at the dam site and working westward, as above stated. Trees in deep portions of the lake adjacent to streams were to be felled and securely anchored for propagating beds for fish, and this work was to be done last.

The words "no grubbing" are understood to mean plaintiff should not be required to remove stumps of trees cut down. Plaintiff's evidence as to his method of clearing was that he first began felling all of the trees in the 200 foot strip around the shore line of the lake, burning tops and brush as he went; that the manager of the Lake Company was desirous of having this strip cleared as quickly as possible so as to visualize the extent of the lake; that the large trees and larger limbs were left on the ground to be sawed up, hauled off or floated away later. The Lake Company retained a right to claim all merchantable timber, which it agreed to remove from the lake bed. However, it waived its claim to the saw logs, but not to the cord wood sizes. On June 2, 1928, the clearing of all the timber, except such small amounts as had been purposely left standing, had been completed. The general manager of the Lake Company had its engineer, upon two occasions, make estimates of the amount cleared, and he had certified plaintiff was entitled to pay for clearing more than 300 acres. Appellant here contends the word "clearing" as used in the contract meant also the cleaning up of the lake site. The contract itself shows the parties thereto treated the word "clearing" as meaning cutting down trees, cutting off limbs and burning brush. Plaintiff did these things.

Where, as here, the parties themselves have put a construction upon the provisions of a contract, the court will accept that construction, unless contrary to the obvious intendment of the contract. In the early case of St. Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121, 128, it was said:

"If the court gives one (an interpretation) differing from that understood by the parties, it in effect makes a new agreement—the very thing most to be avoided. If it leaves the parties to be governed by their understanding of their own language, it in effect enforces the contract as actually made."

This rule has been consistently adhered to since that decision.

Defendant introduced evidence to the effect that there was timber still standing within the lake bed, that trees were not anchored as per contract, that there was brush uncut, saw logs not removed and the lake bed was generally in a bad condition; that it finally cost defendant about $19,000 to complete the clearing of the lake bed. It is in evidence that an unusual flood, occurring after defendant had caused plaintiff to cease work in November, 1928, had washed the unremoved timber into the creek beds, resulting in a mass of debris very difficult to remove. Plaintiff's testimony was that he could have cleaned up the lake in sixty days, at a cost not to exceed $3,000, had he been allowed to complete the job. Others offered to do it for $3250 to $5,000 after plaintiff was removed. It was for the jury to weigh the evidence and decide ultimate facts. We can-

not say, at a matter of law, that the record shows conclusively that plaintiff was in default on his contract with the Lake Company. The evidence was amply sufficient to support the conclusion that he discontinued the work because of default of the Lake Company in making payments when due. This point is ruled against appellant.

The second assignment of error is that the court erred in giving plaintiff's instruction No. 1. This instruction required the jury to find: That after the contract between the Lake Company and plaintiff had been partly performed, plaintiff had ceased work thereunder; that plaintiff ceased work because the Lake Company had not paid him money due as provided in the contract; or because the Lake Company had cancelled the contract, upon declaring him in default; that defendant was financially interested at the time, in the Lake Lotawana development, and, that he would be benefited by the performance of the contract; that, in consideration of such benefits, if any, defendant promised to pay plaintiff the unpaid balance on the contract and damages, if any, to which plaintiff was entitled for breaches, if any, by the Lake Company, in consideration of plaintiff completing said contract; that plaintiff accepted said promise and resumed work pursuant thereto; that plaintiff performed said contract except insofar as he was prevented by the acts, if any, of defendant. On a finding of such facts, the jury was instructed to return a verdict for plaintiff.

Appellant cites cases to the effect that one is not entitled to recover where he contracts to do what he was already legally bound to do. But this instruction first required a finding, in effect, that the prior contract with the Lake Company had been terminated, either by failure of the Lake Company to pay, when due, or by its act on declaring plaintiff in default and the contract cancelled. It cannot be contended in this case that the contract sued upon, made by plaintiff with defendant, was made while the contract with the Lake Company was in existence, and plaintiff bound to perform thereunder. And it is argued the mere fact that defendant was a stockholder in the Lake Company was not sufficient to import a benefit to him which would support a valid consideration for the making of the contract. A case is cited which holds that the fact that one person owns all of the stock of a corporation gives him no such interest that he may maintain a suit in his own name for a tort committed against the corporation. Without more proof than that defendant held all of the stock in the Lake Company, or that he held a mortgage on all of its holdings, appellant's point would be well taken. But there was other proof, as hereinbefore set out, and that evidence was sufficient to support a finding that defendant would be benefited by the performance of the contract he made with plaintiff.

Appellant states defendant acquired no legal right by virtue of the performance of the contract. But it must be conceded that in making the contract, defendant acquired a legal right to have it performed and a concurrent right to recover in damages for any breach thereof by plaintiff. His rights in the contract sued on were not acquired by him as a stockholder, nor as a lienholder, but as a party to a valid and binding contract.

It is next insisted the instruction is broader than the pleadings and the evidence in that it submits the question of the act of the Lake Company in declaring plaintiff in default and cancelling the contract.

It is argued the letter of October 4, 1928, from the Lake Company to the surety did not cancel the contract, but was merely notice to the surety that plaintiff had not completed performance within the time fixed by the contract, and that no notice was given plaintiff; that, as a matter of fact, plaintiff continued work on the premises until November 12, more than a month after the letter was written. The petition alleges the contract was broken by the Lake Company by its failure to pay, by notice to others that plaintiff had failed to perform, and by cancellation of the contract. There was evidence of failure to pay; the letter of October 4, told the surety company that plaintiff had not completed the work as specified in the contract; that he had forfeited the contract and the Lake Company would look to the surety company for all damages. Plaintiff had ceased work on the project in June, except for the work of sub-contractors in removing saw timber, and repeatedly refused to proceed further with the Lake Company. The letter of October 4, to the surety company from the Lake Company was communicated to plaintiff. This part of the instruction was within the pleadings and the evidence.

The next complaint as to this instruction is that it does not require a finding that defendant "wrongfully" prevented plaintiff from performing the contract; that he may rightfully have stopped plaintiff in the performance of the work. But that was not defendant's theory of the case. The answer alleges plaintiff had abandoned the performance of the contract and that the Lake Company had to take it over and complete the job. As to this complaint, it may be said, if plaintiff was going ahead with the performance of the contract as agreed, it was wrongful for defendant to stop him, in the absence of fraud or mistake in the making of the contract. Defendant testified plaintiff was not working fast enough, but plaintiff's evidence was that from October 18 to November 12, there were only nine clear working days, and that he would have completed the job of cleaning away what was left before the water came up, if he had been allowed to continue.

The fourth complaint of this instruction is that it ignores the evidence, issues and the defense. Defendant raised no affirmative

defense except that of the Statute of Frauds. That has already been disposed of. The remainder of his defense negatived plaintiff's case. It is said the instruction ignores the defense that the Lake Company was never in default, but that plaintiff was always at fault, that he had breached the contract and lost all his rights thereunder.

The second and third facts hypothesized by the instruction, i. e., that plaintiff ceased to work because the Lake Company had not paid him money when due; that the Lake Company had declared him in default and had cancelled the contract, required the jury to find those facts. Of necessity they had to find plaintiff was not at fault if they found those facts. Moreover, the court gave defendant's instruction "Q" which told the jury to find for defendant if the failure was caused by the plaintiff and not by the acts of the Lake Company.

Finally it is said the instruction does not require the jury to find plaintiff was damaged. Other instructions given fully covered the issue of damages. This point is ruled against appellant on the authority of Hillin v. Land Co., 296 S. W. 243, 245.

The third, fourth and fifth assignments of error are discussed together. The third relates to the giving of an instruction by the court, at the request of plaintiff, telling the jury that the words "clear" and "clearing" have no legal definition, and directing the jury, in passing upon the issue of whether or not the contract was broken, to determine from the evidence what was the common intention of the parties in using the word. The fourth relates to the refusal of the court to give defendant's requested instruction "I," which would have told the jury that the term "clearing" means that all trees and brush shall be removed from the land, except trees anchored in deep portions of the lake for fish propagating purposes. The fifth relates to the action of the court in permitting witnesses to define or explain the meaning of the words "clear" or "clearing" as used in connection with the work in hand.

In our discussion of points raised under the claim that defendant's demurrer should have been sustained, we have had occasion to consider the interpretation given these words by the parties to the contract. It is apparent there is some ambiguity as to the meaning of the words as used in the contract and it was therefore entirely proper for the court to receive evidence as to the meaning experienced woodsmen placed upon the words, under the circumstances, and to submit the question to the jury. Plaintiff's testimony was that he was to cut all timber, saw or cut off the limbs, burn the limbs and brush, cut merchantable timber up into saw logs and the large limbs into poles. Defendant's testimony was that "clearing" meant to clean everything off clean, except the stumps. The evi-

dence shows there is a difference between clearing land for a lake site and clearing it for purposes of cultivation.

Appellant cites many cases holding it is the duty of the court to ascertain the meaning of a contract from all of its provisions, and not from single words, phrases and sentences, and when the intention of the contracting parties is thus ascertained, that intention will be upheld, unless it violates some inexorable rule of law. That rule would apply in this case if the written contract had contained an absolute provision that plaintiff was not only to cut, but to remove all trees and brush from the lake site, without any exceptions or limitations. There is a limitation as to the merchantable timber, so that it may be said, as a matter of law that the parties intended plaintiff must remove everything and leave the ground clean, except for stumps, in order to complete the clearing of the site. To a farmer or woodsman, clearing land for purposes of cultivation would mean one thing; to an experienced lake builder, clearing land for the purposes of an artificial lake, clearing the lake site would mean another. The word "clearing" is not explained by the provision requiring plaintiff to cut and remove all trees and brush from the premises, in view of the exception in the contract. What was said by the Supreme Court in Finnegan v. Railroad, 261 Mo. l. c. 504-505, 169 S. W. 969, is pertinent here. A locomotive engineer sued for injuries sustained in a collision between his train and another at Cole Junction, Mo. A rule of the company required him to approach Cole Junction "under full control." Evidence as to the meaning of these words was admitted, over objection. The court said:

"The introduction of testimony to determine whether or not the train was under full control, was not improper, and it was therefore permissible for plaintiff and others to testify in regard thereto. [Railroad v. Mortensen, 27 Tex. Civ. App. 106, 66 S. W. 99.] Although the term 'full control' is terse and the ordinary meaning of the words well understood as applied to the movement of a train, its use is technical, and while railroad operatives would doubtless well understand it, a jury might not, and hence the necessity of its explanation."

It may be said in the case at bar that the words "clear" or "clearing" as applied to land for cultivation, have a well defined meaning, but when the particular purpose for which the land is cleared is for a lake bed where the land will be permanently covered, and not used except as a bed for the water, the words may have a different meaning, and testimony of persons familiar with building artificial lakes, as to what was intended, was properly received. The rule applicable here is that where the words have a technical or ambiguous meaning, evidence is admissible to show what persons en-

gaged in that particular line of business have in mind when they use them. The jury doubtless considered the fact that the Lake Company's general manager, who had had previous experience in building artificial lakes, gave the words the same construction as contended for by plaintiff. Likewise, the civil engineer for the Lake Company went over the site, measured the work done and reported to the general manager that plaintiff had cleared the first 150 acres, and later the second 150 acres. The point is ruled against defendant.

The sixth assignment of error is that instruction 3, for plaintiff, was erroneous. This instruction told the jury that the timber felled by plaintiff was his property, under the contract, and if they found that after defendant contracted with plaintiff to complete the original contract, defendant refused to permit plaintiff to remove the timber, such refusal was a breach of said contract by defendant.

Plaintiff's petition contained allegations of this tortious act by defendant. Defendant demurred to the petition because it contained, in the same count, a cause of action for breach of contract and one for tort. The demurrer was overruled as to that part of it. Appellant is in no position to complain. Plaintiff offered evidence that the value of the felled timber was as much as $10,000; he asked for $5,000 damages. There was no question but that it became his property when the Lake Company exercised its option not to take the timber. He had a right to remove it, and it was of no consequence whether the instruction required a finding that defendant's act was wrongful, or whether plaintiff was or was not in default on his contract with the Lake Company. This instruction is not a mere abstract proposition of law, as contended for by appellant, nor did it tend to confuse or mislead the jury, or give undue importance to the facts therein. This was just one of the elements of damage claimed by plaintiff. The instruction was proper.

For a seventh assignment of error it is charged plaintiff's instruction 4 was erroneous. This instruction told the jury that if plaintiff was delayed in the performance of his written contract by the acts of the Lake Company, he was not required to complete the job within eight months, as therein provided, but was entitled to a reasonable time after the expiration of the contract to complete the same. The argument is that plaintiff was entitled only to the amount of time in addition that he was delayed by the alleged acts of the Lake Company, and not a reasonable time. Plaintiff's evidence was that on account of the delay springtime came on before he had finished felling the trees and trimming branches and brush, and that, with the sap rising and leaves coming out, the operations of trimming and burning became more difficult and required a longer time

and more work. In the case of Missouri Bridge & Iron Co. v. Stewart, 134 Mo. App. 618, 114 S. W. 1119, this court said:

"But here the case shows that the parties themselves made a substantial change in the contract which, in effect, did away with the time limit provision, which left a reasonable time, implied by law, for the performance of the work. In such circumstances, it will not do to say that the contractor should yet be held to the time necessary for the changed conditions of the work. That might result in great injustice to the contractor."

The Lake Company wrote the bonding company cancelling the contract eight months and one day after it was made, and declared the plaintiff in default. Because of the Lake Company's delays, he was clearly entitled to a reasonable time in which to complete the work.

Instruction No. 5 is next complained of. It told the jury that if they found the contract was broken by the Lake Company failing to pay any sum of $3200, when 150 acres were cleared, upon such breach, if any, plaintiff had the right to cease work; that if he ceased work on that account, then he was entitled to reasonable time to complete the work, and was not bound to complete it within eight months from February 3, 1928. The same objection is made as to the previous instruction, that plaintiff was not entitled to a reasonable time. It is also claimed to be erroneous because plaintiff never cleared as much as 150 acres. The evidence was that he had, and the jury so found; hence appellant's argument is unsound.

Complaint in five respects is made of plaintiff's Instruction 6, which told the jury that if the Lake Company failed to make payments to plaintiff, as provided by the contract, and this failure to pay delayed plaintiff in the performance thereof, whereby he was required to expend sums of money in excess of the amount he would reasonably expend but for the delay, etc. The contention is that the measure of damages for failure to pay money when due is interest on the money at the legal rate. This was not a suit on a note, or other like agreement to pay money. It was for damages for breach of contract. The Lake Company agreed to pay and did not do so, and plaintiff was delayed thereby. He was entitled to reasonable damages occasioned by the delay.

Complaint also is made of the submission, in this instruction, of alleged delay to plaintiff by failure of the Lake Company to acquire title to certain lands within the lake bed and claim for damages based thereon. It is asserted this delay occurred prior to the making of the oral contract between plaintiff and defendant and it is, therefore, within the Statute of Frauds. This point has been disposed of in our discussion of Point I. It also has been shown that defendant's agreement was to pay plaintiff, not only the balance due on his written contract with the Lake Company, upon comple-

tion of the job, but also whatever damages he had sustained by failure of the Lake Company to perform its part of the contract. And it is urged there was no competent evidence of any damages arising out of the failure to acquire title to certain lands. Plaintiff's evidence was that when he came to certain lands, he was driven off, and his men had to go elsewhere to work, necessitating delay in moving the men and equipment to another place. This issue was for the jury.

The third complaint of this instruction is that it allows plaintiff to recover the difference between the unpaid balance of the contract price and the reasonable cost of removing the remaining timber from the lake site, at the time defendant excluded him from work, without including the defense that plaintiff was not reasonably diligent in removing the timber, and assumes the mere exclusion was wrongful. These points have been considered heretofore and ruled against appellant.

The fourth complaint of this instruction, referring to the provision allowing plaintiff the reasonable value of the timber still on the ground when he was excluded; is the same as the third; and, further that it ignores the contract provision giving the Lake Company the right to so much of the timber as it might want. As to the saw logs, the Lake Company waived its right to those, and as to the poles for cord wood, appellant says there was no sale for it, and it could hardly be given away. It is not seen how this instruction was harmful to defendant.

The fifth complaint of this instruction is as to the Statute of Frauds, which has been disposed of.

Appellant's tenth assignment of error is that the trial court erred in refusing defendant's Instruction "D" and in giving same as modified. This instruction, as asked, would have told the jury that defendant did not assume any liability for the contract between plaintiff and the Lake Company by reason of the article published in the Kansas City Star, "and you cannot consider such advertisement in determining defendant's liability in this case." The part in quotations was stricken out by the trial court, and the instruction given without it. Had the quoted part told the jury that they could not consider the advertisement as establishing defendant's liability in the case, it would have been well enough; but when it withdrew the newspaper statement from the consideration of the jury for any purpose, it went too far. We hold it was a circumstance for the jury to consider in connection with defendant's assertions when the contract sued on was made, to the effect that he had taken over the lake proposition, that he owned it all, and that he would pay for the completion of the work. There was no error in this respect.

The eleventh complaint is of the court's refusal to give defendant's instruction "E" as asked, and in giving it as modified. As given,

this instruction told the jury that a stockholder is not responsible for the debts or obligations of a contract because of his stock ownership; that they could not find against defendant on the contract sued upon *solely* because of the stock which defendant owned in the Lake Company, and the jury should not consider such ownership as determining his liability. The addition of the word "solely" by the court made the instruction stronger for defendant than it was before. It told the jury they could not base a finding against defendant on the mere fact that he was the owner of stock in the Lake Company. The court's action in this respect was not error.

Complaint is made of the refusal of defendant's Instruction "F." This instruction would have told the jury they could not find against defendant on the ground the lake company was indebted to him, and not to consider such indebtedness in determining such liability. There was no such issue in the case as defendant's liability because of an alleged indebtedness of the company to him. This declaration was far afield from the issues in the case and could have served no useful purpose, and would have clouded the issues.

Refusal of defendant's requested Instruction "G" is the basis of appellant's assignment of error numbered 13. That was a peremptory instruction to the jury, declaring as a matter of law that there was no default of the Lake Company in the payment of any money due plaintiff for work done under the contract. We find the evidence on this point was conflicting and the issue was properly submitted to the jury.

Complaint is made of the refusal of the court to give Instruction "H" as asked, and giving it as modified. This instruction told the jury that plaintiff could not recover in this case *solely* because of any interference in work on the Bowman, McGrath & McCandless lands. The court added the word "solely." This instruction, as modified, was more favorable to defendant than to the plaintiff. There was no error in this respect.

The fifteenth assignment of error is that the court erred in refusing defendant's Instruction "N." This instruction would have told the jury that the Lake Company did not become obligated to pay plaintiff anything until he had completely cut and removed all trees and brush from 150 acres of land; that the company could not be found to be in default of payment to plaintiff until it had failed to pay him after he had thus cut and removed all trees and brush from 150 acres of timber land, and that he had no right to cease work on the contract until such contingency arose. Appellant's contention is that this was the proper construction of the contract. It has been shown this is not the case as a matter of law. In this connection, it is to be observed that the defendant asked and the court gave Instruction "Q" which was to the effect that if plaintiff did not com-

plete the work which he was to perform under the contract in the manner provided therein, on or before October 4, 1928, and that such failure was not caused by any default on the part of the Lake Company, as set forth in other instructions, verdict must be for the defendant. It may also be observed defendant did not ask, nor was there given, an instruction in his behalf to the effect that if the plaintiff looked to the Lake Company for payment, or if he knew it received the benefits of his contract with defendant, or that defendant was its agent in the transaction with him, he could not recover. Defendant's theory below was that plaintiff had not performed his contract with the Lake Company, and, therefore, that there was no consideration for his alleged contract with defendant. Litigants are held to the same theory on appeal as that relied upon in the trial court.

Assignments 16, 17 and 18 are directed to the refusal of the trial court to give instructions to the effect that plaintiff was not entitled to any damages for timber remaining on the lake site November 12, 1928, when the Lake Company ordered plaintiff's workmen from the premises; that he should be awarded no damages because of the fact that the trees he cut in the spring were green and covered with leaves; nor could he be awarded any damages for delay due to the Bowman and other controversies. As to the timber, it was the property of plaintiff, under the contract; he was removing it when he was stopped, not by the Lake Company, but by defendant. When he was prevented by defendant from taking his own property, plaintiff suffered damages, if the timber was worth anything. This was for the jury.

As to the sap in the trees and leaves on the limbs, plaintiff's evidence was that, had he not been compelled to discontinue the job by the Lake Company's failure to pay him money when due, he would have cut down and trimmed all the trees while dormant; that he had to do some of this work after the sap started to rise and after leaves were out; that they were harder to cut and the limbs harder to burn, all entailing additional expense on him, the amount of which he estimated. This was for the jury.

The delay on the Bowman and other tracts has already been discussed. Defendant's evidence was that plaintiff could have gone right on with cutting of timber on other tracts. Plaintiff said the fact that he could not proceed on around the lake as he had agreed to do caused him delay in moving his men and equipment to other places. This was a matter for the jury.

Appellant's nineteenth assignment of error complains of twenty-two alleged errors of the trial court in the admission of improper evidence, over defendant's objections. The first criticism is of plaintiff's evidence that he had formed an opinion of the financial re-

sponsibility of the Lake Company. The dialogue between court and counsel shows this was admitted merely for the purpose of showing that plaintiff, when contracting with defendant in October, refused to do business further with the Lake Company because of its financial condition. The court and counsel stated specifically it was not admitted for the purpose of affecting liability between plaintiff and the Lake Company.

The second objection is to the testimony of plaintiff who was permitted to testify as to the value of the felled timber on the lake site. It is said he was not qualified. He qualified by many years of experience in this line, and had sold a considerable quantity from the same tract and knew the prices and values.

The next complaint is of the admission of testimony of the general manager and engineer of the Lake Company as to the estimates made of the amount cleared by plaintiff at various times. It is said this evidence varies the terms of a written contract; that these officers of the Lake Company had no power to vary the terms of a contract made and approved by the board of directors. This latter statement may be conceded, but the testimony was to show the construction placed upon a term which was used in a technical sense—a word which was susceptible of different meanings. This point has heretofore been ruled against appellant.

Further complaint is made of the testimony of Mr. Matches, general manager of the Lake Company, as to how the corporation was organized; that Mr. Thompson advanced practically all of the money that went into it; that the 500 shares of capital stock were endorsed to him in blank as soon as issued; that he held the resignations of all of the officers; that he advanced the money to buy lands that went into the lake and put in some land himself. It is argued this testimony was immaterial and prejudicial. It was properly admitted for the purpose of showing that defendant was financially interested in the development of the lake project, and was preliminary to the showing of what took place at defendant's house when the oral contract was made.

The next objection is to the evidence of this witness as to the lands contracted for but not delivered, and from which plaintiff was excluded, thereby causing delay. As to the Wallace land which appellant says was not in the pleadings, witness said they had the deeds to that. The evidence was competent.

The sixth objection is to the testimony of Matches that, when plaintiff first demanded money, witness had the engineer check up to see if as much as 150 acres had been cleared. Appellant's argument is that not any had been cleared. This reverts to the construction to be placed upon the word ''cleared.'' The witness, Matches, was asked if it was not a fact that the Lake Company had been unable to

pay its own employees, and answered this was true for about two weeks. The objection was that it was immaterial. It was in line with the testimony that the Lake Company had no money, except what defendant advanced it, and was a circumstance showing why plaintiff refused to deal with the Lake Company, and insisted on dealing with defendant. Likewise testimony of this witness that defendant looked over plaintiff's contract with the Lake Company before it was signed, was objected to as immaterial. It tended to show defendant's interest in the matter, which was one of the issues in the case.

Complaint is made that Matches and plaintiff were permitted to give their estimates of the amount of acreage in the lake, because that could be determined by survey. Matches said he based his estimate on his experience, his knowledge of the lake and the survey he had made, and gave his estimate as 568 acres. This was favorable to defendant.

The tenth complaint is that the court overruled defendant's objection to the evidence of witness Matches and motion to strike it out, wherein he said that he had the engineer make measurements and declared that 150 acres had been cleared. This point has been ruled on.

Defendant objected to the testimony of witness Engelbert as to the value of the merchantable timber on the lake site on November 12, when plaintiff was ordered off. The ground of objection was that he was not shown to be qualified. He was plaintiff's employee in charge of the disposition of merchantable timber, and said he had sold some previously and knew what it was bringing. Objection was made to the plaintiff's foreman testifying as to the delay caused by inability to enter certain tracts of land not acquired by the Lake Company. This is the same point made as to the instruction on measure of damages.

Defendant objected to testimony of plaintiff's foreman about a conversation with defendant in which money for payment of the men's wages was demanded of defendant, on the ground that more than 150 acres had been cleared, and defendant told witness to keep on working and the money would be forthcoming in two weeks. This testimony went to the construction placed upon the meaning of the word "clear."

Witness Lillich, plaintiff's foreman, testified that after defendant promised to pay the men, if they continue two weeks more, they did work those two weeks and waited around until after dark for the money to arrive; that it did not come and the men were then given orders on defendant or the company for their pay. This was in conformity with defendant's promise to pay, and was not prejudicial.

Complaint is made that witness Lillich was permitted to testify that, after defendant ordered plaintiff to discontinue work on November 12, witness tendered a bid of $3250, for completing the job. The plaintiff's estimate was that it would cost $3,000 to complete the clearing of the lake site. Defendant's evidence was that it cost approximately $19,000 to do so. The objection to the testimony was that it did not prove, nor did it tend to prove, the measure of plaintiff's damages. Appellant cites a number of cases to sustain her contention. An examination of these cases reveals that they either refer to mitigation of damages, or they are cases in which the contractor failed and the owner sued, or they are cases which actually sustain the contention of plaintiff. The latter relies upon the case of Hillin v. Land Co., 296 S. W. 243, which holds:

"Generally, measure of damages for breach of contract for clearing of timber land is the difference between contract price and cost of finishing work."

To the same effect are the cases of Crescent Mfg. Co. v. Nelson Mfg. Co., 100 Mo. 325, 13 S. W. 503; Olds v. Mapes-Reeves Co., 58 N. E. 478; and Frederick Raff Co. v. Murphy, 147 Atl. 709, cited by appellant. Plaintiff's instruction on the measure of damages was drawn on this theory. The evidence was admissible both as to the measure of damages and as an offset to defendant's testimony as to what it cost to finish the work. Mr. Lillich, an experienced woodsman, testified that it would be easier to cut down trees and burn the brush up to the last of April, than at a later time in the summer, for the reason that the sap is then in the trees, they are harder to cut, and the leaves coming out on the limbs make them twice as hard to burn. This was self-serving and speculative, and some of it was invading the province of the jury, appellant complains. Plaintiff's testimony was that he discontinued work from March 3 to March 22, 1928, because of failure of the Lake Company to pay, according to contract; that he was thereby delayed in cutting trees and burning brush until the sap began to rise and leaves to come out. It was proper to explain to the jury why the job was more difficult later in the season, and to state for what length of time the difficulty continued. It cannot be said as a matter of law that courts will take judicial notice of the time when the sap would begin to rise and leaves come out, on a more or less heavily wooded tract of rough timber land such as this. It might well vary greatly in different localities and in different trees on the same tract.

Appellant says it was error for Mr. English, plaintiff's counsel, to testify as to transactions between him and his client. An examination of the pages cited by appellant shows Mr. Miller, local representative of the bonding company, was on the witness stand and Mr. English was trying to show by him, through correspondence, that

plaintiff was contending to the bonding company that he was not in default on his contract. The trial court excluded the evidence on the objection of defendant.

Complaint is made of the action of the trial court in permitting the introduction of a letter from plaintiff to the bonding company of date March 3, 1928, which told the surety company plaintiff was discontinuing work because $3200 had not been paid, as agreed, on completion of more than the required amount; that the Lake Company was making no complaint of the character of the work, but had assured plaintiff's representative that the work was satisfactory; that plaintiff's information was that the refusal to pay was due to an internal dispute in the Lake Company. Defendant's objection to this letter being admitted was overruled, and the court said:

"I think, with the statement to the jury that this letter is not evidence of the truth of any statement contained in it, why, I think that it is all right to be read to the jury. Otherwise, Colonel English was getting all of these statements from his client."

Mr. English stated from the witness stand that he did not want the jury to understand the statements of fact in the letter to rest on his personal knowledge; that they merely represented plaintiff's claim in the matter. All of these matters had been testified to, both by the plaintiff and the general manager of the Lake Company, and were not in dispute. With the admonition of the court, and the disclaimer of Mr. English, it is not seen how they could have been prejudicial.

Complaint is made of the testimony of witness Colburn, personal representative of plaintiff, that he went to Mr. Matches, general manager of the Lake Company, between February 18th and March 3rd, and tried to collect money; that Mr. Matches had Mr. Sheley, the engineer make the measurements, and found the first payment was due; that they told him Mr. Thompson would not pay the money. It is objected that this was not binding on defendant. It was evidence to support plaintiff's contention that the provision of the contract for payment of money was being breached, and it was immaterial whether Thompson or the Lake Company representative refused to pay.

The next objection is to the testimony of a witness who related a conversation in the office of the Lake Company between witness Colburn, plaintiff, Mr. Matches and engineer Sheley, as to whether the twenty per cent retained would be sufficient to complete the clearing of the lake site, and Mr. Sheley informed Mr. Matches that it would be. This testimony goes to the question of what constituted "clearing" and was competent. The action of the court in permitting witness Montgomery to testify he was willing to clear the lake site for $2500 to $3000, after plaintiff was called off on November

12, is charged as error. This is the same objection as to the testimony of witness Lillich, heretofore discussed.

The last objection of appellant to testimony admitted is that, when the men were not paid, some of them quit and some looked for other jobs. This was admitted to show delay caused by difficulty in keeping a large crew of men together and working steadily. It was clearly admissible.

No other error is complained of, and we find none of record. The judgment was for the right party, and should be affirmed. It is so ordered. All concur.