Leonard O'BRIEN, Plaintiff-Respondent,

v.

**MISSOURI CITIES WATER COMPANY et al., Defendant-Appellant.**

No. 38112.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Oct. 10, 1978.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 17, 1978.

Edward, Seigfried, Runge & Leonatti, Mexico, for defendant-appellant.

Paul F. Niedner, St. Charles, for plaintiff-respondent.

STEWART, Presiding Judge.

Leonard O'Brien, plaintiff, brought an action against Consolidated Water Company (Consolidated) and its wholly owned subsidiary, Missouri Cities Water Company (Missouri Cities) for money due under a contract for consulting services. These parties will frequently be referred to collectively as defendant in the opinion. With the answer defendant filed a counterclaim seeking judgment for payments made to plaintiff in excess of the amounts due under the contract. Defendant also sought damages for breach of a provision of the contract that prohibited plaintiff from engaging in activities contrary to the best interests of defendant. Defendant did not submit an instruction with respect to the claim for damages for breach of contract, therefore this claim has been abandoned and no further reference will be made to it. The jury returned a verdict against defendant on the counterclaim for overpayment and in favor of plaintiff in the sum of $55,740 on his cause of action. Defendant appeals from the judgment entered upon the verdict. We reverse and remand.

The contract sued upon is one of three contracts entered into July 7, 1967, when plaintiff and others sold their stock representing controlling interest in St. Charles Water to Consolidated. St. Charles Water was subsequently merged into Missouri Cities as a subsidiary of Consolidated.

An understanding of the issues requires a detailed chronology of events occurring prior to the sale of St. Charles Water to Consolidated.

Plaintiff and William Dreckshage, real estate developers, and a corporation which they had formed, were the principal stockholders of St. Charles Water, a corporation engaged in the business of providing water services in St. Charles County. St. Charles Water obtained certificates of convenience and necessity (certificates) from the Missouri Public Service Commission (PSC) to operate its business in four areas of St. Charles County.

One of the areas for which St. Charles Water had a certificate was known as the Twillman Area. Within this area Twillman Construction Company operated as a real estate developer and in connection with that operation had formed a water and sewer service company to supply these utilities to purchasers within the development.

Twillman had a temporary certificate from the PSC. In 1965, Twillman was experiencing financial problems and negotiations were initiated between St. Charles Water and the shareholders of Twillman for the purchase of Twillman's water system. In 1966, the interested parties entered into a contract for the purchase of Twillman's water system by St. Charles Water. The price was to be $400,000.00 or the sum determined by the PSC as "net original cost rate base, which is lesser, but [not less than] $250,000.00." As material to our consideration, the contract was subject to and conditioned upon PSC's grant of a certificate to St. Charles Water, PSC's approval of the purchase and PSC's approval of the purchase price and permission of PSC to allow St. Charles Water to obtain a return based upon the purchase price.

A certificate was issued to St. Charles Water encompassing the area in which Twillman operated as well as additional area. The order of the PSC also authorized the purchase of Twillman by St. Charles Water. The PSC did not approve the purchase price but reserved the determination of original costs and the determination of value for consideration at a later date. The order was effective June 10, 1966 and St. Charles Water took possession of the properties of Twillman and operated the water system thereafter. St. Charles collected the revenues and paid the current expenses; it made no accounting to Twillman. St. Charles also paid off a judgment against Twillman.

Before the approval of a purchase price for the Twillman system by PSC, plaintiff and other shareholders sold the controlling interest in St. Charles to Consolidated in exchange for stock of Consolidated, under a contract dated June 7, 1967.[1]

On the same date the parties to the contract of sale of the stock in St. Charles Water executed a contract calling for plaintiff and Mr. Dreckshage to render consulting services to St. Charles Water for a period of two years. Plaintiff and Mr. Dreckshage were each to receive $12,500.00 per year. Of some significance to our consideration of this case, plaintiff and Mr. Dreckshage were to perform services "to complete water and sewer plant construction, original cost hearing before the Missouri Public Service Commission, completion of the Twillman contract for St. Charles and main extension commitments for a period of two years."

The contract which forms the basis of this action bears the same date as the other two contracts and provides for payment for consulting services beginning two years after the date of acquisition of the stock of St. Charles Water as provided in the first contract and continuing for a period of eight years. In consideration of consulting services provided by plaintiff and Mr. Dreckshage, Consolidated agreed to pay ". . . in each year during the term of this agreement, semi-annually, a sum in the aggregate equal to Thirty Dollars ($30.00) per active customer added to the system now owned by St. Charles and within its service area during such semi-annual period (added active customer is defined as a newly added meter). . . ."[2]

The contract provided for a maximum payment based upon the classification permitted by PSC for tap-in fees charged by the defendants. By reason of the action of the PSC the payments were not to exceed $160,000.00. The maximum limitation is not a material consideration in the case.

Defendant submitted its first semi-annual payment along with an accounting for meters added, in January, 1970 and continued to do so through July of 1972. The

---

1. The Twillman contract was consummated in September, 1968 after it was modified by a reduction in price to $209,000.00 in accordance with findings of the PSC. St. Charles Water was a subsidiary of Consolidated when the contract was modified.

2. Plaintiff and Mr. Dreckshage were to share equally in the payments. The contract also provided that upon death or disability of either of them, the payments would be made to the survivor. Mr. Dreckshage died before commencement of the action; hence, the action was brought by plaintiff on his own behalf.

accountings showed a total of 1098 meters added for which $32,940.00 was paid by defendants. Plaintiff did not receive an accounting or payment in January, 1973. He later received a letter dated March 22, 1973, from Missouri Cities signed by a Mr. Lee. Mr. Lee had not been with the Consolidated organization when the contract was drawn. The letter advised that Missouri Cities was not obligated to make payments for new customers added to water main extensions of the system which were not in existence at the time the contract was executed; that as he read the contract they were to pay "$30.00 per active customer added to the St. Charles Water System as constituted on June 6, 1967." Mr. Lee advised that an audit revealed that payments had been made with respect to 194 customers who had been added to main extensions made by defendant which represented an overpayment of $5,820.00. He advised that after allocating a proportionate share to Mr. Dreckshage, plaintiff had been overpaid on 106 additional customers in the sum of $3,180.00 and that this amount would be charged against new customers which would be added in the future to the system as constituted on June 6, 1967. This action on the part of defendant precipitated this litigation.

After the suit was commenced, defendant, in addition to the claim for overpayment of 106 customers added to the main extensions, alleged that it had mistakenly paid plaintiff for customers added to the Twillman area. It is defendant's contention that the Twillman area was not a part of the system "owned by St. Charles and within its service area" as of June 7, 1967, as provided for in the contract; that it had mistakenly paid plaintiff for 476 added customers within the Twillman area that were not called for by the contract. Defendant by its counterclaim sought to recover $14,595.00 for the alleged overpayment.

Plaintiff testified that as of January 1, 1976, there were 2267 meters added after the consulting contract became effective. This included the Twillman area and the water main extensions which had been added to the system after Consolidated obtained control of St. Charles Water. He also testified that in addition to meters there had been 647 tap-ins to apartment units. He stated that adding the tap-ins to the meters would total 2914. Using the figure 2914, the total number in dollars at $30.00 each was $87,420.00. Plaintiff had been paid $32,940.00. As stated above, the jury returned a verdict of $55,740.00.

Other facts and matters of evidence will be set out hereafter.

We consider first defendant's contention that the court erred in giving plaintiff's verdict directing instruction. In considering this issue we combine plaintiff's points I and III. As we view the issues, it is contended that the instruction gave the jury a roving commission to interpret unambiguous portions of the contract.

The instruction reads:

"Your verdict must be for plaintiff on plaintiff's claim for fees due if you believe:

First, that plaintiff and defendant entered in to the Eight year consulting contract referred to in evidence, and

Second, that by reason of that contract defendant agreed to pay certain fees for active water customers added to the system owned by St. Charles County Water Company and within its service area, and

Third, that plaintiff has substantially performed the contract when requested thereto, and has at all times been ready, able and willing to perform his obligations under that contract, and

Fourth, that defendant has failed to pay a part of the fees due and owing on the contract as of January 1, 1976, and

Fifth, that plaintiff was damaged thereby, unless you believe that plaintiff is not entitled to recover by reason of Instruction Number 5."

Specifically defendant asserts that the instruction imposed on the jury the duty to determine the meaning of the term "certain fees for active customers added." Defendant argues that there is no basis for interpretation because the contract clearly and unambiguously defines the fees to be paid

and the basis upon which they are to be paid. Defendant also contends that the phrase "system now owned by St. Charles" is clear and unambiguous and excluded meters placed into water main extensions made after the purchase of St. Charles Water by Consolidated and that it also excluded the Twillman area because St. Charles Water did not own it before the sale to Consolidated.

■ The questioned instruction is not in MAI. A not in MAI instruction should be simple, brief, impartial, free from argument and it must not require findings of detailed evidentiary facts. Rule 70.02(e). Simplicity and brevity however are not to be achieved at the sacrifice of inherent sufficiency. *Buffington v. Fairground Sales Co.,* 402 S.W.2d 59, 63 (Mo.App.1966).

We consider first whether the phrase "by reason of that contract defendant agreed to pay certain fees for active water customers added" gave sufficient guidance to the jury in the factual setting of this case.

By the contract "active customer added" was defined by the parties as "a newly added meter." A meter is a device set into a water line to measure the amount of water used by a customer. A "tap-in" or "tap" is any entry into a water line for the purpose of serving individually occupied units. Not every tap contains a meter. The owner of multiple units, not the water company, determines the number of meters to be installed. St. Charles Water had authority from the PSC to charge a fee for each tap made in its water lines. This fee is referred to as a tap fee.

In this case plaintiff introduced considerable evidence with respect to the number of tap-ins and the amounts received by defendant as tap fees.[3] Plaintiff on direct examination testified that defendant owed him for 2267 "customers added" and added 647 taps made into lines to serve individual apartment units for which there were 54 meters. On the basis of the meters plus the 647 taps, he calculated that the total amount owed to him before credit for payments was $87,420.00.

A part of plaintiff's cross-examination proceeded as follows:

"Q. . . .

Now, what does that contract say about the definition of active customer; would you read that to the jury please?

A. Added active customer is defined as a newly added meter.

Q. Right. Now, do you think that's open to some different interpretation, a customer means a meter?

A. It certainly wasn't my interpretation, let's put it that way.

Q. You think that when a contract says that an active customer means a meter, it really didn't mean that?

---

3. Ten pages of cross examination of one of defendant's witnesses with respect to tap fees culminated with the following:

"[Counsel for plaintiff]: Q. So that the total tap-in fees which Missouri Cities collected from the end of '74 backwards to the end of '69 would be the total of $17,945.00, $71,900.00, $81,880.00, $86,350.00, $55,620.00, $43,134.00; that would be the total for those years?

A. Yes."

Other examples are:

In cross-examination of a witness for defendant:

"[Counsel for plaintiff]: Q. Do you think that is a correct payment to Mr. O'Brien to collect 150 tap fees for 150 customers, users so to speak, and because you put in 11 meters that you only pay him for 11 meters, 11 times $30.00?

A. That's what the contract specified.

Q. (By Mr. Niedner): Well, would you reason you would have a right under this contract to attach one meter for say 250 apartments and paid him one $30.00 fee and collect 250 tap fees, is that what you believe this contract means?

A. Yes, I do. We're following the same procedure Mr. O'Brien used and the same rules he operated under.

Q. (By Mr. Niedner) . . . you have only paid Mr. O'Brien for 11 meters but have collected 150 tap fees and you had a contract to pay Mr. O'Brien a certain consulting fee per customer, isn't that correct?

A. We honored that contract, we paid him $30.00 for each newly added customer, it does not say anything about tap fees.

Q. You think that's a fair construction?

A. If he had been in many contracts—

Q. I just asked you, you think that's a fair construction?

A. Yes, I do."

A. I was looking at the customer tap fees, that's what I was looking at.

Q. But that isn't what the contract says, is it?

A. No, Sir.

Q. And you read the contract.

A. Yes, sir."

At one point when defendant objected to the "confusion of tap fees and meters," the court stated " . . . the jury is going to determine what the contract says."

To the extent that a contract is clear and unambiguous it is the duty of the trial court, not the jury, to declare its meaning by appropriate action. *Kalen v. Steele,* 341 S.W.2d 343, 346 (Mo.App.1960).

In the case before us "active customer added" was given a specific meaning by the parties. The contract defines the term as "newly added meter." The meaning is clear and unambiguous. Plaintiff conceded that by the language of the contract he was to be paid upon the basis of newly added meters. The jury should have been instructed as to the meaning of the term. This is particularly appropriate in this case because there was more testimony concerning the number of "tap-ins" and the amounts of money received by defendant for "tap-ins" than testimony concerning the number of "newly added meters."

As in *Veterans Linoleum & Rug, Inc. v. Tureen,* 432 S.W.2d 372 (Mo.App.1968) the jury here was confronted with a term without established meaning. The meaning of the term was dependent upon the specific definition given to it by the parties for the purposes of the contract. Here the term is "certain fees for active water customers added." The jury was not advised by the instruction that the "certain fees" were $30.00 for each newly added meter. The jury was thus given a roving commission to determine what was meant by "certain fees" and "active water customers added."

The verdict of the jury indicates that it undertook to make its own determination of the term "active water customers added." Plaintiff had the burden of proving his damages. The evidence establishes that the maximum number of meters added to the system including Twillman and main extensions to Twillman and the three remaining areas was 2167. This would approximate $65,000.00. Plaintiff had been paid $32,940.00. The balance due plaintiff under the most favorable view of plaintiff's case would have been approximately $35,000.00. The jury verdict of $55,740.00 more closely approximates plaintiff's calculation of the sums due him including tap-ins as well as newly added meters.

We can only repeat here what was said in *Veterans Linoleum & Rug, Inc. v. Tureen, supra,* "The verdict of the jury shows the construction which it placed upon the contract." It is apparent that the jury was confused by the irrelevant evidence concerning the number and amounts of tap fees. It construed the contract as entitling plaintiff to $30.00 per "tap-in" made into all four areas served by St. Charles Water including all extensions to the system. The term "active customer added" as defined by the contract was clear and unambiguous; its construction was outside the province of the jury. The instruction here gave the jury a roving commission to construe the contract and was prejudicially erroneous. The judgment for plaintiff on his cause must be reversed and remanded.

We consider next defendant's contention that by the terms of the contract plaintiff was not entitled to be paid for meters added to the Twillman area or to extensions and additions made to the water system by St. Charles Water after the sale of the stock to Consolidated. The phrase of the contract for our consideration is that providing for payment of $30.00 "per active customer added to the system now owned by St. Charles and within its service area. . . . ."

It is contended that "system now owned" did not include the Twillman area because legal title had not passed to St. Charles Water at the time of the sale of the stock to Consolidated. It is also claimed that the contract contemplates payment for meters added only to those water mains that were in the ground in all other areas on June 7, 1967.

As to Twillman defendant cites Black's Law Dictionary, Third Edition for the definition of "owned" as "To have good legal title". Further definitions from the same source in the Fourth Edition are, "to hold as property; to have a legal or rightful title to; to have; to possess." From these definitions it can be seen that the terms "owned by", "owner" and the like are not words having a precise definition.

In *Sumpter v. J. E. Sieben Construction Company,* 492 S.W.2d 150, 153 (Mo.App. 1973) it is said, "The term 'owner' is *nomen generalissimum* and is given the widest variety of meaning according to the circumstances." The word "owner" is often "used to describe one who has dominion or control over a thing, the title to which is in another." *State ex rel. Thompson-Stearns-Roger v. Schaffner,* 489 S.W.2d 207, 215[6] (Mo. 1973).

Considering the impreciseness of such terms as "owner" and "owned by" and "person owning" and the lack of definition in the contract it was proper to look to other evidence for the meaning of the phrase "owned by." *Siemer v. Schuermann Building & Realty Co.,* 381 S.W.2d 821, 826[1] (Mo.1964).

In this case, at the time the parties entered into the contract, St. Charles Water had a contract to purchase Twillman. In contemplation of the purchase, St. Charles Water obtained a certificate of convenience and necessity under which it had the exclusive right and obligation to operate the system, it collected the revenues and paid the current bills; it made no accounting to Twillman. Extensions were made to the system under the plaintiff's ownership of St. Charles Water and under the control of Consolidated. St. Charles Water exercised complete dominion and control over the Twillman system. By the terms of the consulting contract plaintiff agreed to assist in expediting the closing on the contract. The contract, the certificates and the operation of this system were recognized by the parties as valuable assets of the corporation.

An ambiguity is an "indistinctness or uncertainty of meaning of an expression used in a written instrument." *Peters v. Briska,* 191 S.W.2d 993, 996 (Mo.App.1946). When an ambiguity exists in a contract the interpretation given to the contract by the parties, as shown by their conduct, may be considered in determining their true intent. *Wentzel v. Lake Lotawana Development Co.,* 226 Mo.App. 960, 48 S.W.2d 185, 195 (1932). In the context of this case the phrase "now owned" is ambiguous so far as the Twillman area is concerned and the meaning of that phrase is for the jury. Defendant paid plaintiff for "newly added meters" to the Twillman System and continued to do so even after it challenged plaintiff's right to fees for meters added to water main extensions in all four areas.

Remaining is the question of whether meters added during the contract period to water main extensions made after Consolidated acquired St. Charles Water Company were clearly excluded by the terms of the contract. Defendant's position is that the "system now owned by St. Charles and within its service area" was confined to the pipes in the ground as of June 7, 1967. Defendant relies heavily on the definition of system as "a set or arrangement of things so related or connected as to form a unity or organic whole," Webster's New Twentieth Century Dictionary, Second Edition. It does not follow from the definition that the fees payable are confined to the pipes then in the ground. It has been said that " 'System' has different meanings when used in different contexts." *Movement against Destruction v. Volpe,* 361 F.Supp. 1360, 1366 n. 6 (D.Md.1973). System has also been defined as a "coherent unification," an "orderly working totality," a complex unity of "often diverse parts subject to a common plan or serving a common purpose," a "set of units combined . . . to form an integral, organic, or organized whole." Webster's Third New International Dictionary 2322 (1966). It is apparent that the phrase here can be understood in either of two or more possible senses and is thus ambiguous. *Chamberlain v. Mutual Benefit Health & Accident Ass'n.,*

260 S.W.2d 790 (Mo.App.1953). We must view the phrase in the context of the entire transaction. The word "system" could be understood as meaning the combination of the four areas to which St. Charles Water had certificates and in which it was authorized to provide water service to a growing community. The words "and within its service area" can be read to limit the extent of defendant's liability so that it would be accountable for all meters placed in lines within the service area but not outside the existing service area. This phrase contemplates the possibility that St. Charles Water might obtain additional authority over contiguous areas. Such an interpretation is supported by the language in the contract which recites defendant's recognition of plaintiff's familiarity with the St. Charles County area, and his working relationship with real estate brokers and developers in the area.

Defendant wrote a letter to PSC in 1971 giving some of the reasons they had entered into the consulting contract. The letter among other things stated, "It is a practice of St. Charles County division to install many mains on private easements to avoid standing costs of highway relocation, the early easements had to be secured by people with knowledge in the area, again a capital item." "The area was growing annually by approximately 500 water customers and 300 sewer customers, many subdivisions, locations and replacements or loops were involved . . .. A person familiar with the capabilities of the individual areas was needed for negotiating with subdividers and familiarity with system capabilities was needed to design other system backup plant insofar as distribution mains were concerned." "Just recently a developer was steered to the company for a new main extension, the attached papers show the nature of the jobs which they rendered services." "Mr. O'Brien stepped in to help with the negotiations for Sunny Meadows, main extension in the St. Peters area." "The company laid several mains in private easements which O'Brien was particularly adept in negotiating."

Also significant is the fact that, as with Twillman, defendant paid plaintiff for all meters added to the system including extensions made after the sale of the stock to Consolidated until Mr. Lee's letter of March 22, 1973.

Defendant cites as conclusive the testimony of the officer of Missouri Cities who drafted the contract that the company intended "system now owned" to mean the water mains in the ground on June 7, 1967. The weakness of this argument is its implicit assumption that the testimony of the parties themselves as to their understanding of what the contract means is the only evidence competent to resolve an ambiguity. This is often the least persuasive evidence. In construing ambiguous contracts the court may consider the relationship of the parties, subject matter of the contract, business usage, surrounding facts and circumstances attending its execution as well as the practical and knowledgeable construction which the parties themselves placed on the contract by their conduct. *Leggett v. Missouri State Life Ins. Co.*, 342 S.W.2d 833, 852 (Mo. banc 1960). Once an ambiguity is determined the weight to be placed on the interpretation of the contract by the parties is for the jury to determine.

The meaning of the phrase "system now owned by St. Charles and within its service area" was ambiguous and thus a proper subject for consideration by the jury. *Ragsdale v. Tom-Boy, Inc.*, 317 S.W.2d 679, 688 (Mo.App.1958).

Other matters raised are not likely to recur in retrial and will not be discussed.

The issue determined here affects not only plaintiff's cause of action but defendant's counterclaim. The cause is reversed and remanded for a new trial on plaintiff's cause of action and on defendant's counterclaim as submitted. *Quality Dairy Co. v. Openlander*, 456 S.W.2d 608, 610 (Mo.App. 1970).

REINHARD and STEPHAN, JJ., concur.